UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| **JANE RIVERS**, <br><br> Plaintiff, <br><br> - against - <br><br> **SUSAN SQUIRES**, Superintendent of Albion Correctional Facility; <br> **ELIZABETH MALDONADO**, Assistant Deputy Superintendent at Albion Correctional Facility; <br> **JONATHAN DEJESUS**, Correction Officer at Albion Correctional Facility <br><br> Defendants. | 23 Civ. 154 <br><br><br> SECOND AMENDED COMPLAINT <br><br><br> <u>Jury Trial Demanded</u> |

Plaintiff **JANE RIVERS**, by and through her attorneys, ZMO Law PLLC and the Law Offices of Daniel A. McGuinness, P.C., as and for her Complaint, hereby alleges as follows based on information and belief:

## PRELIMINARY STATEMENT

1.      This is a civil rights action brought under 42 U.S.C. § 1983 against officials of New York State Department of Corrections and Community Supervision ("DOCCS") who violated the rights of **JANE RIVERS** by sexually abusing her and acting with deliberate indifference to allow that abuse. DOCCS officials and staff knew of the imminent threat of sexual assault to **JANE RIVERS** and deliberately failed to protect her.

2.      Albion Correctional Facility ("Albion CF") is one of three all-female DOCCS correctional facilities throughout the state of New York that houses only

incarcerated women. In 2020, it had an average daily population of 617 incarcerated people, and 638 staff members who may have contact with incarcerated people.

3.      The women at Albion CF were frequently guarded by male officers, who routinely engaged in illegal sexual activity with individual victims over long periods of time. DOCCS supervisors cultivated a culture that allowed male staff to prey on women to satisfy their sexual desires. Male staff were barely supervised. They were often left alone with women under their control for long periods of time in unmonitored areas of the prisons. They had a system of warning each other if a supervisor was approaching and created a climate of fear and intimidation against anyone who complained about sexual assault by an officer.

4.      Though correction officers had body cameras, they were given autonomy in when to turn them on and off, and many were reported to be broken. Thus, correction officers were easily able to avoid suspicion when sexually assaulting incarcerated women with their body camera turned off because the norms were such that they were not expected to have them on, even when alone with incarcerated women outside the view of cameras.

5.      Correction Officer **JONATHAN DEJESUS** ("**CO DEJESUS**") took advantage of these policies. When Plaintiff was assigned to work in the infirmary, where **CO DEJESUS** was the supervisory officer, **CO DEJESUS** followed her from room to room, kissing and groping Plaintiff without her consent, and ultimately forcibly raping her in one of the rooms in the infirmary.

6.      **CO DEJESUS** was allowed to continue working and provided the opportunity to rape Plaintiff despite the fact that a different incarcerated woman (Jane Doe #1) had reported **CO DEJESUS** for retaliating against her after she reported her sexual assault at the hands of a different correction officer.

7.      As rapes and sexual assaults of incarcerated women continued with alarming frequency at Albion, Superintendent **SUSAN SQUIRES** ("**SUPT SQUIRES**") and Deputy Superintendent **ELIZABETH MALDONADO ("DEP MALDONADO")** covered up the assaults by giving lip service to official policies and disciplining individual staff members only when their sexual abuse of incarcerated women became too egregious and notorious to ignore.

8.      The multiple sexual assaults of Plaintiff could have been prevented. DOCCS officials, including both administrators and guards, knew of the danger facing incarcerated women. They knew that multiple confirmed rapes had occurred in Albion CF. They knew individual incarcerated women were complaining of rapes that were "unsubstantiated" because the victims were routinely and unfairly discredited based solely on their status as incarcerated people. They knew substantiated incidents of sexual abuse were ten times higher in DOCCS's female facilities than in male facilities. They knew body cameras were unused, even in areas otherwise uncovered by cameras, ensuring correction officers had the privacy necessary to rape and sexually assault women under their supervision. DOCCS officials knew the policies that needed to be corrected and how to fix their broken culture.

9.     **SUPT SQUIRES** and **DEP MALDONADO** nonetheless deliberately chose not to act, allowing the rapes and sexual assaults to occur and continue.

10.     **JANE RIVERS** now brings suit under the Eighth Amendment to the United States Constitution, 42 U.S.C. § 1983, and New York common law to recover damages for the harm caused by her sexual abuse at the hands of New York prison officials.

## JURISDICTION AND VENUE

11.     Subject matter jurisdiction over the federal constitutional and statutory claims is proper in this Court pursuant to 28 U.S.C. § 1331. This court has jurisdiction to order nominal, compensatory and punitive damages, attorneys' fees and costs, and injunctive and declaratory relief pursuant to 28 U.S.C. § 2201 and 42 U.S.C. §§ 1983 and 1988.

12.     DOCCS operates Albion Correctional Facility in Albion, New York ("Albion CF"), a prison housing only women where the conduct took place.

13.     Albion CF is in the Western District of New York.

14.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because some of the events giving rise to the claim occurred inside the Western District of New York.

## PARTIES

### I.  PLAINTIFF

15.     Plaintiff, known herein pseudonymously as **JANE RIVERS,** was, at all relevant times, a female incarcerated under the direct control and supervision of DOCCS officials.

## II. DEFENDANTS

16.     Defendant **SUSAN SQUIRES** ("**SUPT SQUIRES**") was at all relevant times the Superintendent of Albion CF. **SUPT SQUIRES** is sued in her individual capacity.

17.     Defendant **ELIZABETH MALDONADO** ("**DEP MALDONADO**") was at all relevant times an Assistant Deputy Superintendent and the Facility PREA Compliance Manager at Albion CF. **DEP MALDONADO** is sued in her individual capacity.

18.     Defendant **JONATHAN DEJESUS** ("**CO DEJESUS**") was at all relevant times a correction officer at Albion CF. **CO DEJESUS** is sued in his individual capacity.

## FACTUAL ALLEGATIONS

### I.     GENERAL ALLEGATIONS REGARDING THE TREATMENT OF WOMEN PRISONERS IN NEW YORK STATE

19.     DOCCS operates three prisons across New York State that house only women who have been convicted of crimes.

20.     Albion CF is a medium-security, all-female prison with a total capacity of 1,241 and a population of 613 as of September 2020.

21.     As described in further detail below, women at DOCCS facilities, including Albion CF, are routinely guarded by men working alone.

22.     As a general matter, incarcerated people are required to follow directions or verbal commands given by correction officers.

23.     An incarcerated woman who does not obey a direct order by a male correction officer can be "written up" or subject to discipline, which can include solitary confinement, loss of phone privileges, loss of family visits, or loss of commissary.

24.     The Prison Rape Elimination Act ("PREA") is a 2003 federal law aimed at preventing rape and sexual abuse at prisons. Detailed regulations are in place pursuant to PREA and PREA reports are generated annually. A "PREA complaint" refers to a complaint regarding sexual misconduct inside a prison.

25.     The "Facility PREA Compliance Manager" is the individual responsible for coordinating and monitoring their facility's compliance with PREA standards.

26.     The Office of Special Investigations ("OSI") is a unit within DOCCS that has responsibility for, among other things, investigating allegations of sexual assault.

27.     The "PREA Hotline" is a special phone number that incarcerated people may use to make complaints relating to sexual abuse.

## II. THE SPECIFIC SEXUAL ASSAULTS OF PLAINTIFF BY CO DEJESUS

*A.*     **CO DEJESUS** *raped Plaintiff in the infirmary of Albion CF.*

28.     On or about August 22, 2022, Plaintiff was working in the infirmary at Albion CF.

29.     **CO DEJESUS** was also working in the infirmary on that date.

30.     It was the first day Plaintiff had interacted with **CO DEJESUS.**

31.    **CO DEJESUS** showed Plaintiff a handwritten noted that stated, in sum and substance, "you are so beautiful, when you're not busy will you come talk to me."

32.    **CO DEJESUS** kept the note.

33.    During Plaintiff's shift, **CO DEJESUS** followed Plaintiff into several different rooms, including Isolation 4 and the food prep area.

34.    At different times that day, **CO DEJESUS** kissed Plaintiff on the mouth and the neck, grabbed Plaintiff's hair, told Plaintiff to lift her shirt and kissed and touched her breast, and grabbed her buttocks.

35.    **CO DEJESUS** sexually touched Plaintiff in these ways without Plaintiff's consent or permission.

36.    Plaintiff did not want **CO DEJESUS** to touch her, but was afraid to say no.

37.    Later the same day **CO DEJESUS** directed the other incarcerated woman who was working in the infirmary to go to the other end of the hospital to clean the windows and the door knobs.

38.    **CO DEJESUS** instructed Plaintiff to follow him into the infirmary bathroom, which Plaintiff did.

39.    **CO DEJESUS** kissed Plaintiff and pushed her into the shower area.

40.    **CO DEJESUS** then instructed Plaintiff to turn around.

41.    **CO DEJESUS** ordered Plaintiff to pull her pants and underwear down.

42.     Plaintiff hesitated and did not immediately do what **CO DEJESUS** demanded.

43.     **CO DEJESUS** again ordered Plaintiff to pull down her pants and underwear.

44.     Plaintiff did what **CO DEJESUS** out of fear, and Plaintiff grabbed the handles of the shower as she bent over.

45.     **CO DEJESUS** then raped Plaintiff, putting his penis inside of her vagina.

46.     **CO DEJESUS** ejaculated inside of Plaintiff's vagina.

47.     Plaintiff turned around after he finished, and saw that **CO DEJESUS** was uncircumcised.

48.     **CO DEJESUS** put Plaintiff's hand on his penis, and Plaintiff observed semen on **CO DEJESUS**' penis.

49.     Plaintiff later inserted a tampon in her vagina, using it to collect the semen.

50.     Plaintiff reported the rape late that evening or early the following morning.

51.     The correction officer who Plaintiff initially reported to stated to her, in sum and substance, "Do you really want to do this?"

52.     Only after Plaintiff insisted, did the correction officer call for the sergeant to come speak to Plaintiff.

53.     Eventually, Plaintiff was taken to the hospital and a rape kit was performed.

54.     Upon information and belief, the rape kit, including the tampon, was sent to a laboratory by New York State Police for analysis.

55.     On February 28. 2024 **CO DEJESUS** was sentenced to six months incarcerated, followed by the balance of ten years probation by the Honorable Stanford A. Church in Orleans County Supreme Court, after pleading guilty to Rape in the Third Degree for the rape of Plaintiff.

> B.      *Plaintiff was punished for reporting her rape; she was placed in solitary confinement and then transferred to Bedford Hills CF, resulting in her incarceration being extended three months.*

56.     After she reported to OSI that **CO DEJESUS** raped her, Plaintiff was placed in solitary confinement at Albion CF.

57.     After being held in solitary confinement, Plaintiff was transferred to Bedford Hills Correctional Facility ("BHCF").

58.     As a result of being transferred to BHCF, Plaintiff was unable to complete the class she was taking at Albion CF which would have allowed her to be released from custody in October 2022.

59.     As she was unable to complete the class, she was not released until January 17, 2023.

60.     Plaintiff thus spent three extra months incarcerated solely because she reported that **CO DEJESUS** raped her.

C.   **SUPT SQUIRES** and **Dep MALDONADO** were was on notice that **CO DEJESUS** posed a danger to the women incarcerated at Albion CF before

61.   Jane Doe #1 was sexually assaulted by Correction Officer Thurston Lawrence ("CO Lawrence") at Albion CF in 2021.

62.   In December of 2021, after Jane Doe #1 reported that CO Lawrence assaulted her **CO DEJESUS** put Jane Doe #1 in the bullpen of the medical building's lobby, and told Incarcerated Person #1, who was also in the bullpen, in sum and substance, to "smack the shit out of her [*i.e.* Jane Doe #1]."

63.   In either December 2021 or January 2022, Plaintiff informed Investigator FNU Farrell of OSI that **CO DEJESUS** encouraged another incarcerated woman to attack Plaintiff, as described above.

64.   Upon information and belief, CO Lawrence is currently under investigation for his abuse of Jane Doe #1 and has been removed from his job at Albion CF.

## III.   SUPT SQUIRES AND DEP MALDONADO BY THEIR ACTION AND FAILURE TO ACT CREATED AN ENVIRONMENT IN ALBION CF WHERE SEXUAL ABUSE BY STAFF WAS FREQUENT AND PREDATORY BEHAVIOR BY CORRECTION OFFICERS WAS NOT DETERRED.

65.   As detailed in the following paragraphs, **SUPT SQUIRES** and **DEP MALDONADO** were (1) responsible for preventing sexual abuse by guards against incarcerated people, including the Plaintiff; (2) on notice of the serious risk of sexual abuse by male guards faced by Plaintiff and other women incarcerated Albion CF, including by **CO DEJESUS** specifically; and (3) failed to enact and enforce policies that would have prevented **CO DEJESUS** from sexually assaulting Plaintiff.

10

A. *SUPT SQUIRES* and *DEP MALDONADO* *were responsible for preventing sexual abuse at Albion CF.*

66.    **SUPT SQUIRES** was at all relevant times responsible for the safety of the incarcerated people at Albion CF. **SUPT SQUIRES** was at all relevant times responsible for creating and enforcing policies and practices that ensure the safety of the incarcerated people at Albion CF.

67.    The United States Department of Justice ("DOJ") regulation at 28 C.F.R. § 115.11(c) requires an agency that operates more than one facility to designate a PREA compliance manager at each facility with sufficient time and authority to coordinate the facility's efforts to comply with the PREA standards. **DEP MALDONADO** was at all relevant times the individual charged with these responsibilities for Albion CF. **DEP MALDONADO** reported directly to Jason Effman, a DOCCS Associate Commissioner and the agency's PREA coordinator, and she was charged with monitoring compliance with and enforcing policies to prevent sexual assault and retaliation at Albion.

68.    Despite repeated instances of officer sexual abuse of incarcerated women at DOCCS facilities, **SUPT SQUIRES** and **DEP MALDONADO** failed to enact or enforce policies to correct the pervasive custom of abuse at Albion CF.

B. *SUPT SQUIRES* and *DEP MALDONADO* *were aware of the substantial risks of sexual abuse faced by female prisoners in DOCCS facilities.*

69.    **SUPT SQUIRES** and **DEP MALDONADO** were aware that the substantial risk and numerous incidents of sexual abuse of incarcerated women at the hands of male prison guards led the federal government, the District of

Columbia, and all fifty states to enact statutes criminalizing any sexual contact between prisoners and corrections staff.

70.    **SUPT SQUIRES** and **DEP MALDONADO** were aware that in New York the substantial risk and numerous incidents of sexual abuse of female prisoners at the hands of male guards led to the criminalization of any sexual contact between prisoners and correctional staff in the enactment of N.Y. Penal Law § 130.05(3)(e), which states that a person committed to the care and custody of DOCCS is incapable of giving consent to sexual activity.

71.    **SUPT SQUIRES** and **DEP MALDONADO** were aware that the substantial risk and numerous instances of custodial sexual abuse led to the enactment of PREA in 2003.

72.    **SUPT SQUIRES** and **DEP MALDONADO** were aware of the general findings of a 2018 report by the DOJ's Bureau of Justice Statistics that since the implementation of the National Standards to Prevent, Detect, and Respond to Prison Rape in 2012, allegations of staff-on-inmate sexual misconduct in Corrections Departments nationwide increased 191%, and substantiated incidents of staff-on-inmate sexual misconduct increased 48.5%.

73.    **SUPT SQUIRES** and **DEP MALDONADO** knew that custodial sexual abuse continued to be a pervasive problem at Albion CF in 2022.

74.    DOCCS reported in its June 2021 "Annual Report on Sexual Victimization 2014-2018" (the "2021 DOCCS Report") that OSI received 383

12

complaints of staff sexual abuse and harassment in 2014. It also received 427 in 2015, 333 in 2016, 296 in 2017, 399 in 2018 and 481 in 2019.

75.    **SUPT SQUIRES** and **DEP MALDONADO** knew that although incarcerated women made up less than five percent of the entire incarcerated population, they disproportionally made up a larger share of complaints for sexual victimization.

76.    **SUPT SQUIRES** and **DEP MALDONADO** also knew that the average rate of substantiated allegations per 1,000 incarcerated people was more than 10 times higher at female-only facilities than male-only facilities for 2016, 2017, and 2018.

77.    Based on their experience working at Albion CF, **SUPT SQUIRES** and **DEP MALDONADO** knew that the actual number of sexual assaults and rapes at Albion CF must have been much higher than the reported number.

78.    For a number of reasons and from a variety of sources, **SUPT SQUIRES** and **DEP MALDONADO** were aware that assigning male staff to guard female prisoners creates obvious risks of sexual abuse.

79.    **SUPT SQUIRES** and **DEP MALDONADO** were aware that **CO DEJESUS** had retaliated against Jane Doe #1 for reporting sexual abuse she suffered at the hands of Officer Lawrence before **CO DEJESUS** raped Plaintiff.

80.    **SUPT SQUIRES** and **DEP MALDONADO** failed to discipline **CO DEJESUS** for retaliation against Jane Doe #1.

81.    **SUPT SQUIRES** and **DEP MALDONADO** were aware that the substantial risk and incidents of sexual abuse in a prison setting led to the promulgation of international standards prohibiting the assignment of male corrections staff to guard women prisoners. United Nations Standard Minimum Rules for the Treatment of Prisoners, Rule 53, adopted Aug. 30, 1955.

82.    **SUPT SQUIRES** and **DEP MALDONADO** were aware that the risk and incidents of sexual abuse in a prison setting, including the particular risks facing women prisoners, led several states and local correctional institutions to require the presence of female staff to guard women prisoners, and even to remove men from guarding women prisoners, at least in housing areas.

83.    **SUPT SQUIRES** and **DEP MALDONADO** were aware that women prisoners were a particularly vulnerable population who faced a heightened risk of sexual abuse by male officers. A larger number of incarcerated women have histories of sexual and physical abuse than male prisoners or women who have never been incarcerated. One study conducted in 1999 found that 70% of incarcerated females in the New York State Maximum security facilities had been previously physically abused, and 60% had been previously sexual abused.

84.    **SUPT SQUIRES** was aware that these abuse histories make women especially vulnerable to coercion and manipulation. A 2013 report by the DOJ Bureau of Justice Statistics concluded that people who experienced sexual victimization before coming to the facility were more likely than people with no

sexual victimization history to report incidents of sexual victimization involving other incarcerated people and staff.

85.    The DOJ's Bureau of Justice Statistics periodically releases reports of anonymous surveys on sexual victimization in prisons and jails. The last time that women prisoners in New York were included in the survey, New York State prisoners self-reported the highest rates of staff sexual abuse in the nation.

86.    **SUPT SQUIRES** has been party to a number of injunctive and damages cases brought in both state and federal courts by women prisoners who have been victims of staff sexual abuse. The cases include the putative class action litigation *Amador v. Andrews*, Case No. 03 Civ. 0650 (S.D.N.Y.), which was brought on behalf of 17 named plaintiffs in 2003, and *Jones v. Annucci*, Case No. 16 Civ. 1473 (S.D.N.Y.), which was brought on behalf of seven named plaintiffs in 2016.

87.    Numerous instances of staff sexual misconduct at DOCCS facilities by officers have resulted in criminal charges in the past 6 years, including at Albion CF. **SUPT SQUIRES** and **DEP MALDONADO** were aware of at least the following instances that resulted in criminal actions against DOCCS staff who worked at Albion CF:

a.    In June of 2014, John M. Randolph, a correction officer at Albion CF was arrested and charged with third-degree rape of an incarcerated woman.

b.    In October of 2016, Christopher Claud, a correction officer at Albion CF was arrested and charged with forcible touching of an incarcerated woman.

c.    In November of 2017, Daijon Talford, a correction officer at Albion CF was arrested and charged with official misconduct related to an unlawful relationship with an incarcerated woman.

d.    In 2019, David Stupnick, an Albion CF correction officer plead guilty to sexually abusing two incarcerated women.

e.    In 2020, James Castonguay, an Albion CF correction officer plead guilty to sexually abusing two incarcerated women.

88.    **SUPT SQUIRES** and **DEP MALDONADO** knew that cases that result in criminal prosecutions or the discipline of staff do not reflect the entire universe of staff misconduct, given that only reported incidents of sexual misconduct, harassment, and abuse are investigated, and **SUPT SQUIRES** and **DEP MALDONADO** knew that staff sexual abuse is significantly underreported.

89.    Victims of sexual abuse, generally, are unlikely to come forward with complaints of sexual misconduct due to embarrassment and humiliation and a fear that such complaints will be greeted with skepticism or disbelief.

90.    These concerns are exacerbated in a correctional setting, where the persons to whom such complaints are to be made are colleagues of the perpetrators of the abuse, putting the victim at risk of retaliation; where complaints of such abuse are not maintained in a confidential fashion; and where there is a well-founded belief by women prisoners that such complaints will be greeted with skepticism and will not result in any action against the perpetrator.

91.     The failure of **SUPT SQUIRES** and **DEP MALDONADO** to implement and enforce policies and practices that would actually prevent and punish all sexual abuse contributed to a lenient and permissive prison culture and increases the risk of sexual abuse of women prisoners.

92.     Some of the abuse that took place in DOCCS facilities was deemed by staff to be "consensual." In other words, the incarcerated women were not necessarily subjected to physically forcible abuse, but rather appeared to enter into sexual contact voluntarily. However, any purportedly "consensual" sexual activity between corrections staff and the women they are paid to guard and control is a fallacy, regardless of the "willingness" of the incarcerated person. Consent in such circumstances is non-existent under the law, as nearly every state legislature in the United States has recognized. Purportedly "consensual" sexual activity between incarcerated people and officers does not resemble actual "consent" as it might exist outside of the prison context.

C.      ***SUPT SQUIRES** and **DEP MALDONADO** failed to enact supervisory policies that would prevent sexual abuse by male staff and failed to enforce existing policies.*

93.     Despite known risks and frequent incidents of sexual misconduct by staff, **SUPT SQUIRES** and **DEP MALDONADO**, through their policies and practices (or lack thereof) recklessly disregarded these risks and failed to protect the women prisoners in her custody from harm. **SUPT SQUIRES** and **DEP MALDONADO** inadequately supervised corrections staff, placing women prisoners at a heightened risk of sexual abuse.

94.    **SUPT SQUIRES** and **DEP MALDONADO**, failed to enact appropriate rules and policies concerning the behavior of male staff and failed to enforce existing rules and policies governing staff behavior.

     i.    **SUPT SQUIRES** permitted male correction officers to be alone with incarcerated women for long periods of time, which created an unjustifiable and unreasonable risk of harm to Plaintiff and predictably led to sexual abuse.

95.    Despite knowledge of the risk of sexual abuse in women's prisons, **SUPT SQUIRES** permitted the assignment of male staff, including **CO DEJESUS**, to posts on which they had ample opportunity for unmonitored contact with incarcerated women, including Plaintiff.

96.    **SUPT SQUIRES** supervised male staff guarding incarcerated woman no differently from the way she would supervise same-gender supervision of men.

97.    Male staff, including **CO DEJESUS**, were assigned, alone, to areas where no other staff were within range for visual contact. This includes assignments that cover remote or isolated areas not monitored by video surveillance and even overnight shifts in housing areas.

98.    Despite the availability of body cameras for correction officers, **SUPT SQUIRES** permitted correction officers to choose not to use body cameras at times when correction officers were alone with incarcerated women and outside the range of other video surveillance.

99.    Allowing male staff long periods of unsupervised contact not only allows ample time for sexual abuse of incarcerated women, but also fosters an

18

environment where male staff can develop personal relationships with incarcerated women to groom and coerce them into sexual acts over time.

100.    **SUPT SQUIRES** knew many incidents of sexual abuse that occurred at DOCCS facilities, including the ones leading to the arrest and prosecution of staff members above, arose out of instances where a single male staff member is assigned to guard incarcerated women for prolonged periods.

101.    **SUPT SQUIRES** knew that changing the policy at Albion CF to prohibit a single male staff member from watching incarcerated women for prolonged periods would immensely reduce the risk of sexual abuse of incarcerated people by staff, but she chose not to implement that policy, formally or in practice.

102.    **SUPT SQUIRES** allowed **CO DEJESUS** to be the only officer assigned to the infirmary, which gave **CO DEJESUS** the freedom to sexually assault Plaintiff.

103.    Following Jane Doe #1's complaint of retaliation by **CO DEJESUS**, **SUPT SQUIRES** permitted **CO DEJESUS** to continue be the sole staff member assigned to the infirmary, allowing him to rape Plaintiff.

104.    The sexual assault of Plaintiff and many others would not have occurred if **SUPT SQUIRES** had implemented a policy to prohibit a single male officer from guarding incarcerated women for prolonged periods of time.

105.    The sexual assaults of Plaintiff, and many others would not have occurred if **SUPT SQUIRES** had implemented a policy requiring use of body

cameras when male officers were alone with incarcerated women in areas not otherwise covered by cameras.

> ii.    **SUPT SQUIRES** failed to enact or implement policies for staff to carry out unannounced and random supervisory rounds, which created an unjustifiable and unreasonable risk of harm to Plaintiff and predictably led to sexual abuse.

106.    **SUPT SQUIRES** not only permitted a single male correction officer to be alone with incarcerated women for long periods of time but failed to enact and enforce adequate rules and policies to ensure that unannounced, random supervisory rounds were conducted, which would have mitigated the high risk of sex abuse.

107.    Supervisory rounds consist of a supervisor checking in on various posts throughout the facility to oversee correction officers and ensure there is no problem. Random and unannounced supervisory rounds would deter correction officers from forming inappropriate relationships with incarcerated women or sexually abusing them.

108.    Although DOCCS ostensibly promulgates rules and regulations requiring random and unannounced supervisory rounds, in practice, at Albion CF supervisory rounds are not random, unannounced or carried out in any useful way.

109.    Supervisory rounds at these facilities consisted of merely stopping by the assigned line officers' desk or office, signing the logbook and nothing more.

110.    There was no requirement that supervisory staff must see each officer on duty, check in verbally with each officer, ask the officers any particular questions, speak with the prisoners on a housing unit or program assignment, or

ask them if they have problems, or that they observe the entire area, the prisoners and the staff, for any misconduct, or make any notations on what they observe.

111.    **SUPT SQUIRES** failed to require a set number and frequency of supervisory rounds by most supervisory officers. Only rounds by the Superintendents and their executive teams were required at a specific frequency, and that is only once a week, with no other written policies and procedures directing the frequency and regularity of rounds. In practice, sergeants typically visit each post once or twice per shift.

112.    **SUPT SQUIRES** failed to require unpredictable supervisory rounds. Facility supervisors routinely conducted rounds in a predictable manner, failing to vary their time, frequency, and point of entry, leaving staff able to predict periods of time, such as the time around shift change or after a supervisor has passed through, when they can virtually be assured that they can engage in misconduct with women prisoners without being discovered.

113.    **SUPT SQUIRES** knew that in many previous sexual abuse cases of incarcerated women at Albion CF, the lack of proper supervisory rounds had facilitated the sexual abuse.

114.    At Albion CF, staff members routinely radio ahead to let other staff members know when supervisory rounds are coming. Upon information and belief, **CO DEJESUS** was frequently informed by fellow staff members whenever a supervisory round would be coming to his post.

115.    **SUPT SQUIRES** failed to create or enforce policies that led to supervisory rounds being conducted without notification to officers.

116.    Despite the arrest of multiple correction officers at Albion CF, **SUPT SQUIRES** made no changes to the practice of announcing supervisory rounds to other officers.

> iii.    **SUPT SQUIRES** failed to install or cause the monitoring of existing cameras, and to require the use of body cameras to prevent sexual abuse of incarcerated women.

117.    To the extent **SUPT SQUIRES** installed or required installation of surveillance cameras, use of those cameras for supervision was, at all relevant times, grossly inadequate to protect women prisoners.

118.    Surveillance cameras were not installed throughout Albion CF. Many enclosed and isolated areas inside the prison or isolated areas outside the prison, where sexual abuse is more likely to occur, or has been reported to have occurred, are completely outside of any video or audio surveillance. These areas included portions of the infirmary, storage closets, laundry rooms, slop sink areas, sheds, outside work areas, and basements.

119.    Where video cameras did exist, they were not adequately monitored, if at all. No staff member at Albion CF was assigned to view the cameras in real time, or soon thereafter.

120.    Video camera footage was reviewed only after an incident had been reported to see if corroboration existed.

121.    Video camera footage was not monitored to detect or deter the formation of improper relationships by officers with incarcerated women.

122.    Correction officers were given body cameras, but **SUPT SQUIRES** did not create policies to ensure the body cameras would be used in a manner that would prevent sexual abuse of incarcerated women by correction officers.

123.    Despite multiple instances of sexual assaults happening in the same areas at Albion CF, including in the infirmary where **CO DEJESUS** raped Plaintiff, cameras were either not set up or were not monitored to prevent rape and sexual abuse.

124.    **SUPT SQUIRES** allowed correction officers, including **CO DEJESUS**, to leave their body cameras turned off when they were interacting alone with incarcerated women in areas not covered by surveillance cameras.

125.    If **CO DEJESUS** had been required to turn on his body camera when he was working, he could not have followed Plaintiff into rooms without video cameras, and kissed, molested, and raped her..

iv.    **SUPT SQUIRES** and **DEP MALDONADO** created a culture and custom at DOCCS facilities where complaints of sexual abuse were ignored and retaliation permitted against those who reported.

126.    **SUPT SQUIRES** and **DEP MALDONADO** created a culture and custom of where reports of sexual abuse were frequently ignored, or insufficient follow-up action was taken.

127.    By failing to investigate or discipline correction officers who did not report sexual misconduct by other officers, **SUPT SQUIRES** and **DEP MALDONADO** created a culture where sexual abuse of incarcerated women was common.

128.   **SUPT SQUIRES** and **DEP MALDONADO** created a culture whereby **CO DEJESUS** could retaliate against a woman who reported sexual assault with impunity.

129.   It was widely known to DOCCS correction officers and staff that they would not get in trouble for failing to report inappropriate staff relationships with incarcerated women. A culture of silence on the issue was encouraged.

130.   In the criminal cases listed above in ¶85, and the many other unprosecuted cases in that period, other officers at the facilities knew about ongoing relationships between the incarcerated victim and staff-abuser and did not report them.

131.   Despite repeated incidents of sexual abuse and rape at Albion CF, not a single staff member has been disciplined, punished, or terminated from employment based solely on a failure to report an inappropriate relationship.

132.   **SUPT SQUIRES** and **DEP MALDONADO** failed to create or implement properly policies to protect incarcerated women from retaliation by the staff at Albion CF.

133.   **SUPT SQUIRES** allowed, or caused, Plaintiff to be sent to solitary confinement, than transferred to BHCF, with the result that Plaintiff was punished for reporting by spending time in solitary confinement, being transferred further from her family (including her young child), and spending three extra months in prison.

v.   **SUPT SQUIRES** and **DEP MALDONADO** failed to create or enforce policies to remove correction officers who sexually abused incarcerated women.

134.   **SUPT SQUIRES** and **DEP MALDONADO** failed to enact or enforce polices to remove correction officers from incarcerated women in situations where it was discovered that a correction officer had sexually abused an incarcerated woman.

135.   **SUPT SQUIRES** and **DEP MALDONADO** often allowed staff to continue to work closely with the same incarcerated women who reported sexual assault or retaliation by a specific staff member.

136.   Staff who were the subject of credible or repeated allegations of sexual abuse were allowed to continue their usual posts and permitted to access private, unmonitored areas. They were even permitted to continue to guard or to have contact or proximity with the prisoner who had complained about the officer.

137.   This case is an alarming example of such unconscionable misconduct. Despite Jane Doe #1's report about **CO DEJESUS'** retaliatory attack on her for reporting her sexual assault, **CO DEJESUS** was allowed to work in the infirmary alone with incarcerated women, including Plaintiff.

138.   DOCCS repeated failure to remove officers from incarcerated women they were alleged to have abused or retaliated against emboldened **CO DEJESUS** and other staff members to conduct similar behavior and discouraged other staff from making complaints about misbehavior. Allowing these officers to remain in their posts with the same privileges, at times monitoring their alleged victims,

conveyed to DOCCS staff that any written policies to the contrary would not be enforced unless overwhelming corroboration existed.

> vi.    **SUPT SQUIRES** and **DEP MALDONADO** created a culture of intimidation and fear at Albion CF facilities where incarcerated women lacked confidentiality in reporting incidents of sexual abuse, feared retaliation and did not think they would be believed.

139.    **SUPT SQUIRES** and **DEP MALDONADO** created a culture of intimidation when they failed to provide incarcerated women with a confidential way of reporting incidents of sexual abuse.

140.    As alleged in the related case *Jane Doe v. Squires, et al.*, 22 Civ. 796, **DEP MALDONADO** retaliated against at least one other woman who reported sexual assault by an officer.

141.    Incarcerated people were aware that reporting what had happened to them could result in retaliation by staff at Albion CF, including compounding the abuse they had already suffered as a result of policies more likely to perpetuate sexual abuse than prevent it.

142.    Sexual abuse complaints at Albion CF were not treated as confidential.

143.    Correction officers frequently exchanged and spread information about sexual abuse of incarcerated women.

144.    No policy was enforced to deter correction officers from spreading supposedly confidential information.

145.    Incarcerated people knew that their complaints would not be kept confidential, and that they would be risking retaliation.

146.    Incarcerated people also knew that they were likely to be disbelieved or discredited if they reported sexual abuse by staff.

147.    Incarcerated people also knew that they would face retaliation from staff, including by **CO DEJESUS** specifically.

148.    **SUPT SQUIRES** and **DEP MALDONADO**, by failing to enact or enforce sufficient policies, created a culture in which initial complaints by incarcerated women were discouraged and disbelieved.

149.    Incarcerated women were made more vulnerable to sexual assault, manipulation, and coercion by a correction officer since they knew that a complaint about inappropriate behavior would be discouraged and disbelieved.

## FIRST CAUSE OF ACTION
## CRUEL AND UNUSUAL PUNISHMENT
## VIOLATION OF U.S. CONSTITUTION AMENDMENT VIII
### (By Plaintiff Against CO DEJESUS)

150.    Paragraphs 1–146 are hereby incorporated and realleged.

151.    By forcefully penetrating Plaintiff's vagina with his penis, groping her breast and buttock, and kissing Plaintiff's mouth and neck, **CO DEJESUS** acted willfully and wantonly for his own sexual gratification.

152.    There was no penological justification for **CO DEJSUS's** conduct.

153.    **CO DEJESUS's** conduct was unreasonable and in violation of Plaintiff's clearly established constitutional right to be free from cruel and unusual punishment.

154.    **CO DEJESUS's** conduct constituted cruel and unusual punishment under the Eighth Amendment of the U.S. Constitution.

## SECOND CAUSE OF ACTION
## RAPE IN THE THIRD DEGREE
## VIOLATION OF N.Y. PENAL LAW § 130.25
### (By Plaintiff Against CO DEJESUS)

155.    Paragraphs 1–151 are hereby incorporated and realleged.

156.    In or about August 2022, **CO DEJESUS** penetrated Plaintiff's vagina with his penis while Plaintiff was incarcerated and thus incapable of consent.

157.    There was no penological justification for **CO LAWRENCE**'s conduct.

158.    Such touching violated N.Y. Penal Law § 130.25.

159.    Plaintiff's suffered emotional and mental anguish and other damages as a result of the violation of the N.Y. Penal Law.

## THIRD CAUSE OF ACTION
## NEW YORK COMMON LAW BATTERY
### (By Plaintiff Against CO JESUS)

160.    Paragraphs 1–156 are hereby incorporated and realleged.

161.    The rape and molestation by **CO DEJESUS** of Plaintiff constituted a battery upon Plaintiff in that the above-described bodily contact was intentional, unauthorized, and grossly offensive in nature.

162.    Such contacts caused serious psychological, emotional pain and suffering, and otherwise caused damage to Plaintiff for which Defendant is liable.

## FOURTH CAUSE OF ACTION
## DELIBERATE INDIFFERENCE
## VIOLATION OF U.S. CONSTITUTION AMENDMENT VIII
### (By Plaintiff Against SUPT SQUIRES and DEP MALDONADO)

163.    Paragraphs 1–159 are hereby incorporated and realleged.

164.    **SUPT SQUIRES** and **DEP MALDONADO** were aware that male correction officers at Albion CF were repeatedly accused, charged, and criminally convicted of sexually abusing incarcerated women.

165.    **SUPT SQUIRES** and **DEP MALDONADO** were aware that **CO DEJESUS** retaliated against Jane Doe #1 for reporting a sexual assault committed against her by Officer Lawrence.

166.    **SUPT SQUIRES** and **DEP MALDONADO** were directly and personally responsible for the safety of incarcerated people at Albion CF.

167.    **SUPT SQUIRES** and **DEP MALDONADO** failed to implement and enforce policies sufficient to protect incarcerated women, including Plaintiff, at Albion CF from sexual abuse by male correction officers.

168.    **SUPT SQUIRES** and **DEP MALDONADO** created a custom and unspoken policy, through their actions and failures to act, in which Albion CF staff were not disciplined for sexual misconduct.

169.    **SUPT SQUIRES** and **DEP MALDONADO** were deliberately indifferent to a serious risk to the safety of all incarcerated women at the hands of male correction officers at Albion CF.

170.    **SUPT SQUIRES's** and **DEP MALDONADO's** actions and failures to act permitted and caused **CO DEJESUS** to rape and sexually assault Plaintiff, which he would not have done if **SUPT SQUIRES** or **DEP MALDNADO** had acted reasonably as superintendent and PREA compliance manager, respectively, of Albion at that time.

### FIFTH CAUSE OF ACTION
### RETALIATION FOR REPORTING MISCONDUCT
### VIOLATION OF U.S. CONSTITUTION AMENDMENT I
### (Against SUPT SQUIRES)

171.    Paragraphs 1–170 are hereby incorporated and realleged.

172.    **SUPT SQUIRES** allowed or ordered Plaintiff to be held in isolation after she reported that **CO DEJESUS** raped her.

173.    **SUPT SQUIRES** allowed or ordered Plaintiff to be moved to BHCF after she reported that **CO DEJESUS** raped her.

174.    Plaintiff suffered psychological, emotional and mental damages related to her isolation immediately after she was raped.

175.    Plaintiff was incarcerated an additional three months because she was transferred to Bedford Hills CF.

176.    Plaintiff suffered psychological, emotional and mental damages related to being moved farther from her family and young child after she was raped.

177.    The placement in isolation and move to Bedford were done in retaliation for the fact that Plaintiff reported **CO DEJESUS**'s attack on her.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and demands judgment in her favor on each of their claims against defendants as follows:

a.    That a jury find, and the Court adjudge and decree, that Plaintiff shall recover compensatory damages in the sum of $25,000,000, plus punitive damages in the sum of $25,000,000 against the defendants, plus nominal

damages in the sum of $1 against the defendants, jointly and severally, together with interest.

b.      That Plaintiff recover the costs of the suit herein, including reasonable attorney's fees pursuant to 42 U.S.C. § 1988.

c.      That Plaintiff be awarded such other and further relief as the Court shall deem just and proper.

## JURY DEMAND

178.     Plaintiff hereby demand a trial by jury on all issues and counts

in the Complaint herein.

Dated:          New York, New York
                April 8, 2025

                    Respectfully submitted,


                By: _____/s/_____
                        Daniel A. McGuinness

                LAW OFFICES OF DANIEL A.
                   MCGUINNESS, PC
                353 Lexington Avenue
                New York, NY 10016
                Tel: (212) 679-1990
                Fax: (888) 697-0585
                Email: dan@legalmcg.com


                        - and -


                By: _____/s/_____
                        Zachary Margulis-Ohnuma
                        Tess M. Cohen

                ZMO LAW PLLC
                353 Lexington Avenue, Suite 900
                New York, NY 10016
                Tel: (212) 685-0999
                Fax: (212) 685-0922
                Email: zach@zmolaw.com